**Richard PITTARD, Plaintiff,**

v.

**WATKINS ASSOCIATED INDUSTRIES, INC., and Watkins Associated Industries, Inc. Group Health Protection Plan, Defendants.**

**Civil Action No. 1:96–CV–1197–JOF.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1997.

Malcolm P. Smith, Kevin A. Doyle, Lokey & Smith, Atlanta, GA, for Plaintiffs.

Gregory C. Braden, David A. Benoit, Alston & Bird, Atlanta, GA, for Defendants.

## ORDER

FORRESTER, District Judge.

This action, brought under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), is before the court on a variety of procedural and dispositive motions.

## I. STATEMENT OF CASE

### A. *Statement of Facts*

#### 1. *The Plan and the Benefits Under the Plan*

Defendant Watkins Associated Industries, Inc. Group Life Insurance and Health Protection Plan (the "Plan") is an employee welfare benefit plan as defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(1). The Plan provides medical expense reimbursement to eligible employees of Defendant Watkins Associated Industries, Inc. ("Watkins"), and its subsidiaries. The Plan and the benefits provided under the Plan are funded by a trust maintained pursuant to the Plan. Watkins

---

**1.** The Plan appears as Exhibit 3 to Defendant's Summary Judgment Appendix. The Summary Plan Description appears as Exhibit 4 of Defendant's Summary Judgment Appendix.

**2.** *See* Plaintiff's Response to Defendant's Statement of Material Facts as to Which There is No Genuine Issue to be Tried, ¶ 4.

**3.** In particular, Plaintiff complained of:

and its subsidiaries and the participating employees make fixed monthly contributions to the Plan's trust. All funds held in the Plan's trust are applied solely for the benefit of the covered employees under the Plan, and the Trust document forbids any reversion of assets held in the Trust to the Plan sponsor or any subsidiary thereof. The Plan is maintained pursuant to a plan document that includes a Summary Plan Description.[1] Although the Plan does not include the Summary Plan Description and does not expressly incorporate by reference the Summary Plan Description into the Plan,[2] the Summary Plan Description contains the written terms of medical reimbursement coverage provided under the Plan. In particular, the Summary Plan Description includes a provision that states:

> Any medical or dental condition for which a Participant was treated or has symptoms before the Participant's effective date will be excluded from coverage under this Plan for one year after the initial eligibility date. A diagnosis of the condition is not required, only the existence of treatment or symptoms.

#### 2. *Plaintiff's Medical Claim Under the Plan*

Plaintiff Richard Pittard ("Plaintiff") became employed by Tucker Door and Trim Corporation on January 11, 1993, and he became eligible for coverage under the Plan one month later on February 11, 1993. At the time he began working, Plaintiff received a copy of the Summary Plan Description.

In November of 1993, Plaintiff experienced symptoms of shortness of breath and chest tightness upon exertion.[3] Plaintiff's cardiologist, Dr. Shonkoff, diagnosed Plaintiff with

intermittent episodes of palpitations in his chest as well as weakness. The patient states that he has recently been having spells where he has an aura and then feels his throat tightening, his face becoming flushed and becomes weak and dizzy with some shortness of breath. Watkins Claim File, attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT0060.

critical aortic stenosis in his bicuspid aortic valve. On December 1, 1993, Dr. Langford performed surgery on Plaintiff to replace the stenotic bicuspid aortic valve. The discharge summary, which was dictated by Kenneth L. Norris, P.A., listed Plaintiff's admitting diagnosis as "aortic valve disorder" and the principal diagnosis as "congenital aortic valve insufficiency." Following Plaintiff's surgery, claims were submitted to the Plan by Plaintiff's physician and hospital totaling $50,300, and were ultimately denied based upon the pre-existing condition clause in the Summary Plan Description.

Aortic stenosis is a degenerative disease that causes a narrowing of the aortic valve, usually over a period of many years. Although it is disputed whether the diagnosis was properly made at the time, Plaintiff was diagnosed with aortic stenosis as a child.[4] Further, in March of 1989 Plaintiff visited Dr. Weinberg at the Gwinnett Pulmonary Group complaining of shortness of breath and chest pain when he exerted himself. Plaintiff smoked one and a half to two packs of cigarettes a day for thirty years and did not engage in regular exercise. After Plaintiff was given an echocardiography, the echocardiography report showed a diagnosis of "valvular aortic stenosis with marked left ventricular hypertrophy and normal left ventricular systolic function," and "minor aortic insufficiency." Plaintiff also performed a thallium stress-cardiologist exam during which he exercised thirteen minutes to exhaustion. The test concluded that coronary artery disease could be ruled out as a cause of his symptoms. Plaintiff also underwent a pulmonary examination in 1989, which concluded that sarcoidosis could be ruled out as a cause of his symptoms.[5]

### 3. Review of Plaintiff's Medical Claim

Initially, Plaintiff's claim was reviewed by the Plan's claims personnel, including Janet McGhee, who was a claims processor, Ginny Dibrell, who was a claims supervisor, and Nick Blanchard, who was a claims manager for Watkins Associated Industries, Inc. Blanchard has a vocational nursing degree from Maricopa College in Arizona and has been licensed as a vocational nurse. They concluded that Plaintiff's 1989 symptoms were referable to his stenotic bicuspid valve and that his subsequent surgery in 1993 was therefore based upon a pre-existing condition.

Plaintiff appealed that decision and sought a first review of the claim denial.[6] As a result, Toni Kraft, Director of Health Care Benefits for the Plan, conducted a review. Kraft has over twenty-three years of experience in the medical claims processing industry, including positions as a claims processor and supervisor of claims processing. Kraft has testified that she conducted her own review of the claim file, including the medical records obtained from Plaintiff's physicians, the Merck Manual, the Stedman's Medical Dictionary medical reference books, a letter from Dr. Shonkoff dated May 17, 1994, and a

---

**4.** Plaintiff, who is approximately forty-seven years old, testified that he was born with a murmur and was improperly diagnosed as having aortic stenosis due to the inferior technology available at that time. *See* Plaintiff's Dep. at 19. Plaintiff has averred that he learned that he had a heart defect involving a non-stenotic bicuspid aortic valve rather than aortic stenosis based upon a 1984 echocardiogram. *See id.* at 17. Plaintiff, however, has also admitted that the bicuspid valve has a tendency to become calcified or stenotic over time. Plaintiff's Brief In Support Of His Motion For Summary Judgment And In Opposition To Defendant's Motion For Summary Judgment, at 2–3.

**5.** The unsigned pulmonary examination report, which was dated November 14, 1989, stated: "R*O Sarcoidosis." *See* Watkins Claim File, attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT0077–78. According to Plaintiff, however, sarcoidosis continued to be suspected as a cause of his symptoms by Plaintiff's doctors at The Pulmonary Group. Dr. Weinberg allegedly stated on November 14, 1994 that "pulmonary function test was suggestive of mild obstructive ventilatory defect" and that "Abnormal chest x-ray, stable but suggestive of sarcoidosis or occult reflux." *See* Watkins Claim File, attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT0064.

**6.** *See* Watkins Claim File, attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT00028.

letter from Dr. Langford dated April 5, 1994.[7] In Dr. Shonkoff's letter, the doctor concluded that, based upon his review of Plaintiff's medical records, Plaintiff had no "significant symptoms" of aortic stenosis before 1993. Dr. Shonkoff then stated:

> I feel that you are morally reprehensible in not agreeing to pay for Mr. Pittard's lifesaving surgery and it is because of decisions like this that have caused the government to try to step in and overhaul our health care system. In Mr. Pittard's case, there is no health care crisis. Mr. Pittard has returned to work, has been a productive employee, and I feel he deserves the benefit of the doubt in this case.[8]

Dr. Langford's letter set forth in relevant part that:

> Prior to [November 1993], he did not have "surgically" significant aortic stenosis. According to my records, prior to this time, he had no treatment for aortic stenosis nor symptoms referable to aortic stenosis.... I hope this letter will help clarify matters regarding Mr. Pittard's insurance coverage.[9]

Kraft also obtained another medical review from Aetna Medical Consulting Services ("Aetna"), the Plan's independent technical consultant on claims issues.[10] Dr. Tsoulos, Aetna's physician, reviewed Plaintiff's medical records and concurred that Plaintiff has a pre-existing condition, stating:

> patient did have periods of shortness of breath and chest pain—the latter marked-ly different from that produced by his esophagitis, more clearly related to the congenital aortic valve defect, in 1989. In view of this symptomatology i(?) 1989 related to the aortic valve defect, pts condition existed prior to 2/11/93 and must be considered a preexisting condition.[11]

Quoting this report, Kraft notified Plaintiff and his cardiologist by letter that his medical claims would still be denied based upon the second review of the claim.[12]

Plaintiff appealed the second denial to the Plan's Administrative Committee. According to Plaintiff, he requested a copy of the physician reviewer's report and told the Plan's Administrative Committee that Dr. Shonkoff was available to confer with them and the physician reviewer if the committee had any questions regarding Plaintiff's medical records. Neither Plaintiff nor his physicians, however, provided any new information to the Plan in support of his appeal.

Under the Plan, the Administrative Committee has the authority to interpret and construe the terms of the Plan and to decide all questions concerning the eligibility of participants for benefits thereunder. The committee members, including Kraft, Richard Wuori, and William Freeman, reviewed the claim file, and Wuori directed that a legal review be performed by the Plan's outside counsel. After reviewing the claim file, including the opinion of Aetna's physician and the letters from Plaintiff's physicians and the legal review, the Administrative Committee concluded that Plaintiff's 1993 surgery was to

7. Kraft Aff. ¶ 9. Plaintiff has averred that her subsequent letter merely quoted the review of Dr. Tsoulos, discussed immediately *infra*, and did not state that she reviewed the file again or made any conclusion.

8. Watkins Claim File, Attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT00040–41.

9. Watkins Claim File, Attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT00033.

10. However, Plaintiff has disputed whether Aetna is an "independent" consultant, given that Aetna is Watkins' preferred provider of medical services for Watkins' 5,000 employees and that the Summary Plan Description encourages Watkins' employees to use Aetna.

11. *See* Watkins Claim File, attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT00037. Yet, Plaintiff claims that the report is unclear as to whether Dr. Tsoulos actually read the pre-existing conditions clause listed in the Summary Plan Description and that his conclusions are vague.

12. *See* Watkins Claim File, attached as Exhibit 10 to Defendant's Motion for Summary Judgment, p. WAT00052.

correct a stenotic bicuspid aortic valve, that Plaintiff had had a stenotic bicuspid aortic valve and symptoms referable to it in 1989, and that the claims of the physicians and hospital from the 1993 surgery should be denied under the Plan's pre-existing condition provision.

### B. *Procedural History*

Plaintiff commenced this ERISA action on May 14, 1996. The discovery period was originally scheduled to expire on November 6, 1996. Plaintiff, however, filed a motion to extend discovery until November 30, 1996, and this motion technically remains pending before this court [11–1]. The Local Rules require parties to file their motions for summary judgment no later than twenty (20) days after the close of discovery. L.R. 56.1C.[13] Thus, Defendant Watkins Associated Industries, Inc. (hereinafter "Defendant"),[14] proceeded to file its motion for summary judgment twenty days later, on December 20, 1996 [12–1]. Plaintiff delayed in filing his motion for summary judgment until he filed his response to Defendant's summary judgment motion on January 13, 1997 [14–1]. Without filing a response to the substantive matters contained within Plaintiff's motion for summary judgment, Defendant moved to strike Plaintiff's motion for summary judgment based upon its untimeliness [20–1]. In addition, Defendant moved for leave to file a reply brief in support of its own summary judgment motion beyond the page limitation [19–1] and a motion to exclude the expert testimony of Dr. Blase A. Carabello ("Dr.Carabello") taken during an evidentiary deposition on November 20, 1997 [11–1]. These motions are discussed in detail *infra.*

## II. DISCUSSION

As a preliminary matter, the court agrees that Plaintiff's motion for summary judgment is out of time and thereby in violation of the Local Rules of this Court. Defendant's motion to dismiss is therefore GRANTED [20–1]. Defendant's motion for leave to file a reply brief in support of its motion for summary judgment is GRANTED [19–1]. In addition, Plaintiff's motion to extend discovery until November 30, 1996, is DENIED as moot [10–1].

### A. *Defendant's Motion to Exclude Expert Testimony of Dr. Carabello*

After Plaintiff disclosed his intention to call Dr. Carabello as an expert witness at trial, the parties attempted to schedule a time for Defendant to depose him. Based upon postponements that arose due to Dr. Carabello's failure to produce a written report pursuant to *Fed.R.Civ.P.* 26(a)(2), the deposition ultimately was scheduled after the official close of discovery on November 20, 1996, in Charleston, South Carolina. Defendant received a one and a half page letter or report from Dr. Carabello on November 7, 1996, which also fell outside of the discovery period.[15] In that report, Dr. Carabello stated that the data or information he considered in forming his opinion was "unaccountable and stem from thousands, if not tens of thousands, of pages of literature on this topic examined by me since I began to do research in the aortic valve in 1976." Dr. Carabello also indicated that he used "the patient's echocardiograms from 1989 and 1993" as part of the exhibits or evidence upon which he based his opinions.

The undersigned held a telephone conference with the parties on November 19, 1996, to discuss a dispute arising over Plaintiff's desire to conduct an evidentiary deposition of Dr. Carabello immediately following the discovery deposition. The court indicated that Plaintiff's proposed deposition plan was "satisfactory" but stated that the court was willing to grant a protective order to Defendant "to limit the trial deposition to the clinical

---

13. Formerly L.R. 220–5(c).

14. Plaintiff subsequently amended his complaint to add the Plan as a defendant in this action [26–1].

15. This report is attached as Exhibit B to Defendants' motion.

observations contained in the report and any literature identified by close of business today." [16] Defendant received a letter from Plaintiff's counsel at 5:00 p.m. on November 19, 1996, that merely identified by number forty-six (46) different publications of medical literature that had been listed in Dr. Carabello's curriculum vitae. The curriculum vitae itself had been sent to Defendant on September 9, 1996.[17] Plaintiff had originally listed at least 121 publications in Dr. Carabello's curriculum vitae .[18]

The discovery and evidentiary depositions went forward on November 20, 1997. During those depositions, however, Dr. Carabello testified that he based his opinion regarding the existence of pre-existing conditions on his personal examination of two videotapes that Plaintiff's treating physicians in 1989 and 1993 reviewed in preparation of the echocardiogram reports. Counsel for Defendant did not receive copies of the actual echocardiogram videotapes until November 27, 1996. On this basis, Defendant moves to exclude Dr. Carabello's testimony for non-disclosure of the videotapes pursuant to *Fed.R.Civ.P.* 26(a)(2)(B) and 37(c)(1). Plaintiff points to the reference in the report referring to "the patient's echocardiograms" and to the *American Heritage Dictionary,* which defines the term "echocardiogram" as "[a] visual record produced by an echocardiograph." [19] Plaintiff also relies upon the Merck Manual, which refers to two-dimensional echocardiography with the statement that "[t]hese 'real time images' are recorded on videotape...." According to Plaintiff, Defendant is confused about the distinction between an echocardiogram and an echocardiography report, but should have been aware that one refers to a visual image that may be captured on videotape while the other refers to a written report concerning that visual image. Plaintiff

asserts that Defendant could have requested the videotapes from his medical providers before denying Plaintiff's medical claims or even after receiving Dr. Carabello's report or that Defendant's expert, Dr. Harvey Sacks, could have told Defendant that echocardiograms were videotapes.

Having been read and considered, the motion to exclude the expert's testimony is GRANTED for the following reasons. Although Plaintiff technically complied with this court's instruction by "identifying" forty-six pieces of literature by the close of business on November 19, 1996, the court finds that mere reference to that many publications at five o'clock on the evening before a deposition to which counsel for both parties needed to travel was highly unreasonable. The court understands that Dr. Carabello may have meant to refer to the videotapes by mention of the cardiograms. However, Dr. Carabello failed to include a specific reference to their existence or his reliance in his report. *See, e.g., Smith v. State Farm Fire and Casualty Co.,* 164 F.R.D. 49, 54 (S.D.W.Va.1995) (finding expert reports that "refer to massive amounts of documents as the basis for the opinions which are expressed in vague terms, with few specific references and no exhibits provided" as insufficient). Moreover, counsel for Plaintiff should have turned over this medical diagnostic well in advance of these depositions instead of waiting for Defendant to request them with the magical words. *See id; see also Peters v. Systems Specialized Carriers, Inc.,* No. 4:94–CV–68AS, 1996 WL 204486 (N.D.Ind. April 9, 1996) (expert report should have contained photographs and demonstrative videotape of accident scene).

### B. *Defendant's Motion for Summary Judgment*

Defendant Watkins bases its summary judgment motion on several grounds. First,

---

**16.** A copy of the court's comments, which were sent by facsimile to the parties on November 19, 1996, is attached as Exhibit C to Defendants' motion to exclude the expert testimony.

**17.** *See* Exhibit D to Defendants' motion.

**18.** Dr. Carabello's curriculum vitae is attached with Exhibit C and Exhibit E to Plaintiff's Response.

**19.** *See* Plaintiff's Response To Defendant's Motion To Exclude Expert Deposition Of Dr. Carabello And Motion For Reasonable Attorneys Fees, at 1–2.

Defendant argues that the Plan gave the Plan Administrative Committee discretionary authority and, as a result, the court must limit its review of the decision of the Plan Administrative Committee to determine whether a reasonable basis existed for the decision based upon the facts known at the time of the decision. Second, Defendant argues that its decision to deny benefits clearly satisfies this reasonableness standard and it was not arbitrary and capricious. In response, Plaintiff contends that the court should apply a more rigorous standard of review because there was a conflict of interest in this case in that the employer was responsible for issuing, funding, and interpreting the Plan. According to Plaintiff, the court should determine that the symptoms Plaintiff exhibited in 1989 were not attributable to aortic stenosis and therefore that Defendant improperly denied benefits on the basis of a pre-existing condition.[20] However, if this court adopts the standard of review advocated by Defendant, Plaintiff asserts that the decision was arbitrary and capricious in light of the testimony of Dr. Carabello and the letters that Plaintiff's treating physicians submitted during the appeal of the denial.

### 1. Standard of Review

■ Before assessing whether the claimant has proposed a "reasonable" interpretation of the plan under which he could be covered, the court must determine the proper standard of review of Defendant's decision to deny Plaintiff's claim. *See Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1549–52 (11th Cir.1994). The decision to deny a beneficiary benefits as challenged under 29 U.S.C. § 1132(a)(1)(B) should be reviewed under a *de novo* standard of review

unless "the benefits plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Company v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Lee*, 10 F.3d at 1549 (11th Cir.1994). In cases in which the plan administrator or fiduciary has such discretionary authority, courts apply the "arbitrary and capricious" standard of review to benefits decisions. *Id.* at 1550. Under that highly deferential standard, a decision will be upheld—even if it is wrong—as long as the decision is reasonable. *Id.* In the case at bar, it is undisputed that the Plan gave the Administrative Committee the authority to interpret and construe the terms of the Plan and to decide all questions concerning the eligibility of participants for benefits under the Plan. Accordingly, it appears that the arbitrary and capricious standard of review should apply.

■ However, if the beneficiary demonstrates that the determination of the plan administrator or fiduciary would advance "a conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries" then the fiduciary must show that its interpretation was not tainted by self-interest. *Brown v. Blue Cross & Blue Shield of Alabama*, 898 F.2d 1556, 1566–67 (11th Cir. 1990), *cert. denied*, 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991); *Lee*, 10 F.3d at 1552. Plaintiff has argued that the court should apply a heightened standard of review given that Defendant issued and interpreted the plan and that Defendant allowed its own employees, who aside from Blanchard did not have medical training, to determine the viability of Plaintiff's claims. In support of his position, Plaintiff has asserted that the fact that the Plan does not pay every claim indi-

---

**20.** Plaintiff also has argued that the Plan does not incorporate by reference the Summary Plan Description and does not actually contain the pre-existing condition clause upon which the decision to deny benefits was based. The court does not find this argument availing. The Plan specifically states in its review procedure for claims that notice of denial of a claim shall include reference to the Plan provisions and "to

the portions of the summary plan description upon which the denial is based." *See* Article 6, Section 6.01(b), attached as Exhibit 4 to Defendant's Motion for Summary Judgment at 13. In addition, it is undisputed that Plaintiff received a copy of the Summary Plan Description at the commencement of his employment with Tucker Door and Trim Corporation.

cates some form of self-interest at work and that Dr. Tsoulos, from whom Kraft obtained an outside medical opinion, was not "independent" by virtue of Aetna's position as the preferred provider of the Plan. He has also pointed to the fact that the Plan encourages its 5,000 members to use Aetna. The court disagrees with Plaintiff's arguments as to the existence of a conflict. *See Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452, 1459 (10th Cir.1991) (citation omitted) ("fact that an [a]dministrator serves dual roles as company employee and as a pension plan fiduciary does not conclusively or presumptively establish that the administrators of the plan have acted arbitrarily and capriciously."); *Newell v. Prudential Ins. Co. of America,* 904 F.2d 644, 648 (11th Cir.1990); *see also de de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1191 (4th Cir.1989).[21]

The Eleventh Circuit recently addressed the issue of conflicts of interest in *Cagle v. Bruner,* 112 F.3d 1510 (11th Cir.1997). In that case, an ERISA plan was seeking to require a claimant to execute the plan's standard subrogation agreement without modification as a condition precedent of payment of the claims while the claimant was challenging the denial of benefits. *Id.* Affirming the district court's decision that no conflict of interest existed, the Eleventh Circuit stated:

> [c]onflicts arise when a fiduciary or administrator pays benefits to participants and beneficiaries from its own assets; an example is an insurance company administering an ERISA plan that the company also insures. *See Brown,* 898 F.2d at 1561. In that situation, the insurance company's role as administrator "lies in perpetual conflict with its profit-making role as a business." *Id.* In contrast, the Fund is a non-profit entity, and benefits are paid out of a trust funded from the contributions of several employers. In such an arrangement, the Fund's decision to require a signed subrogation agreement merely pro-

> tects the assets in the trust for other participants and beneficiaries. The requirement does not benefit the Fund (i.e., the trustees) in any way which could create a conflict of interest at the expense of a plan participant or beneficiary.

*Cagle,* 112 F.3d at 1516.

A similar arrangement exists in the instant case. The Plan and the benefits thereunder are funded by a trust maintained pursuant to the Plan. Watkins and its subsidiaries and the participating employees make fixed monthly contributions to that trust. All funds held in the Plan's trust are applied solely for the benefit of the covered employees under the Plan, and the trust document forbids any reversion of assets held in the trust to Watkins or its subsidiaries. Moreover, Plaintiff has not contended or shown that Defendant is exposed to unfunded liabilities of the trust thereby providing an improper incentive to deny claims.

As the court is not convinced that a conflict of interest exists, the court must determine whether Defendant's decision was arbitrary and capricious.

### 2. *Reasonableness of Decision to Deny Medical Benefits*

■ Plaintiff contends that the symptoms he exhibited in 1993 were different from the "generic complaints of shortness of breath and chest pain" that he had experienced in 1989. Plaintiff argues that Defendant seized upon the discharge language indicating "aortic valve disorder" and "congenital aortic valve insufficient," that physician review was only a general surgeon and not a cardiologist and did not even address the 1989 stress test, and that nothing aside from Kraft's opinion rebutted the treating cardiologists' opinion that his critical aortic stenosis was not preexisting. Finally, Plaintiff points to the fact that Defendant relied upon the echocardio-

---

**21.** In *de Nobel v. Vitro Corp.,* for example, the Fourth Circuit did not find a conflict of interest based upon the plan administrator's decision to deny benefits favorably impacting the trust's balance sheet. *Id.* at 1191. The Fourth Circuit also rejected the argument that "fiduciaries of a fully funded, defined-benefit ERISA trust cannot be considered 'impartial' if they also serve as employees of the plan's sponsor." *Id.* at 1191–92 (citations omitted).

graph reports from 1989 and 1993 instead of obtaining the videotapes of the echocardiograms from 1989 and 1993. Plaintiff therefore asserts that Defendant's denial was arbitrary and capricious because the denial was based upon unqualified, incomplete and inaccurate opinions.

In making its assessment of reasonableness, however, the court may "look only to the facts known to the administrator at the time the decision was made" to deny Plaintiff's medical benefits under the pre-existing conditions clause in the Summary Plan Description. *Lee*, 10 F.3d at 1550 (citing *Jett v. Blue Cross & Blue Shield of Alabama, Inc.*, 890 F.2d 1137, 1139 (11th Cir.1989)).[22] Based upon those facts, the court has determined that a reasonable basis existed for the decision. *See Jett*, 890 F.2d at 1139.

At the time the decision to deny Plaintiff's claims based upon the pre-existing condition provision was made, the Plan's Administrative Committee had only the medical records, the review of Dr. Tsoulos, the letters of Dr. Shonkoff and Dr. Langford, and correspondence from Plaintiff. It is undisputed that Plaintiff had a bicuspid valve, which is considered a congenital heart defect that has a tendency to become stenotic or calcified over a period of time. After Plaintiff sought medical attention for shortness of breath and chest pain, both symptoms of aortic stenosis, the 1989 echocardiograph report as found at page WAT00138 of the Watkins Claims File clearly indicated a diagnosis of "valvular aortic stenosis with marked left ventricular hypertrophy," and "minor aortic insufficiency." The medical records also seem to rule out as a cause and/or distinguish the symptoms from those caused by pulmonary problems, gastrointestinal problems, and coronary artery disease. When Plaintiff was discharged in 1993, the discharge summary clearly stated that Plaintiff's admitting diagnosis involved "aortic valve disorder" and "congenital aortic valve insufficiency." Furthermore, after reviewing Plaintiff's medical file, Dr. Tsoulos, in his capacity as Aetna's medical consultant, confirmed the relationship to a congenital aortic valve defect and the existence as a preexisting condition.[23]

Aside from the medical records outlined above and the outside medical consultant's opinion, the only other evidence before the Plan Administrative Committee were the letters from Dr. Langford and Dr. Shonkoff. Dr. Shonkoff summarily concluded that, prior to 1993, Plaintiff had had no *"significant symptoms."* Dr. Langford stated that Plaintiff did not have *"surgically" significant* aortic stenosis prior to 1993. It appears to this court that the treating cardiologists distinguished the critical aortic stenosis diagnosed in 1993 from the aortic stenosis diagnosed in 1989 largely upon the degree of the degenerative disease. Upon the court's review, however, the pre-existing condition clause does not hinge upon the degree of symptoms involved or even require an actual diagnosis of the condition.

To this end, the court finds somewhat instructive the case of *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 90 (4th Cir.1996), in which the Fourth Circuit upheld the denial of benefits under *de novo* review in analogous circumstances based upon a similar pre-existing condition exclusion provision. In *Haley*, the claimant had complained about numbness

---

**22.** Accordingly, Plaintiff has misplaced his reliance upon the testimony of Dr. Carabello—even if it were admissible. *See Lee*, 10 F.3d at 1549. In addition, other evidence such as Dr. Shonkoff's testimony that the echocardiogram in 1989 actually showed Plaintiff's aortic valve area as being 1.06 cm 2 and therefore not critical is not relevant to this court's review.

**23.** The fact that Dr. Tsoulos did not specialize in cardiology does not render reliance upon his opinion to be arbitrary and capricious. *See Roberson v. General Motors Corp., Detroit Diesel Allison Div.*, 801 F.2d 176, 180 (6th Cir.1986)

(reliance upon internist in denial of psychiatric disability claim). Absent evidence that Dr. Tsoulos was "financially dependent" on Aetna or Aetna "financially dependent" upon the business provided by Watkins, the court also is unwilling to assume that Dr. Tsoulos was incapable of providing an independent or impartial opinion. *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 601–02 n. 14 (5th Cir.1994). Aetna's relationship with Watkins as a preferred provider under the Plan involving possibly 5,000 members does not clearly indicate such financial dependence.

and tingling in his legs while visiting a doctor in a follow-up examination merely to obtain prescription refills for ankylosing spondylitis, a disease involving stiffening of the spine. *Id.* at 90. His condition subsequently worsened during the next three months, however, with the claimant later developing neuropathies-ankylosing and becoming disabled. *Id.* at 88–90. Dismissing the evidence that the numbness was not "a major complaint" or that it was the purpose of the prior visit, the Fourth Circuit still determined that "the very disease Haley discussed ... [on the prior visit] worsened and caused Haley's disability." *Id.* In a similar vein, it does not appear unreasonable for Blanchard, Kraft, Dr. Tsoulos, or the Plan Administrative Committee to determine that Plaintiff had a related pre-existing condition in 1989.

Furthermore, it is undisputed that neither Dr. Shonkoff nor Dr. Langford had seen Plaintiff prior to 1993. Kraft testified that she reviewed these opinions in light of the fact that both doctors were awaiting payment of fees for claims they had submitted for Plaintiff's 1993 treatment. Dr. Shonkoff felt compelled to express his distaste for Defendant's denial of the claim in his letter and stated further, "I feel he deserves the benefit of the doubt in this case." Based upon the clear economic interests of these doctors who had not treated Plaintiff prior to 1993 and their conclusory opinions outlined above, it was not unreasonable to find that this evidence should be discredited. *See Jett v. Blue Cross & Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1139–40 (11th Cir.1989) (rejecting argument that treating physician's opinion should receive substantial weight in light of economic interest); *see also Brooks v. Protective Life Ins. Co.,* 883 F.Supp. 632, 638 (M.D.Ala.1995), *aff'd,* 77 F.3d 498 (11th Cir. 1996); *Toliver v. Trustees of Purina Benefit Association,* 853 F.Supp. 427, 431 n. 6 (M.D.Ga.1994), *aff'd,* 53 F.3d 1287, 1995 WL 262079 (11th Cir.1995).

Accordingly, for the foregoing reasons, the court does not find the decision to deny Plaintiff medical benefits to be unreasonable or arbitrary or capricious.

### III. CONCLUSION

Plaintiff's motion to extend time for discovery is DENIED as moot [10–1]. Defendant's unopposed motion to file brief in excess of page limitation [19–1] is GRANTED. Defendant's motion to dismiss Plaintiff's motion for summary judgment as untimely is GRANTED [20–1]. Plaintiff's motion for summary judgment is therefore DENIED [14–1].

Defendant's motion to exclude expert testimony is GRANTED [11–1]. Defendant's motion for summary judgment is GRANTED [12–1].