**James EARNEST, Jr., Plaintiff,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY and Home Depot U.S.A., Inc., Defendant.**

No. 2:02–CV–468–FTM–26TGW.

United States District Court, M.D. Florida, Tampa Division.

Oct. 7, 2003.

Carol Ann Avard, Douglas D. Mohney, Avard Law Offices, P.A., Cape Coral, FL, for plaintiff.

Ralph C. Losey, Alan Harrison Brents, Katz, Kutter, Alderman & Bryant, P.A.,

Amanda Huter Reher, Rissman, Weisberg, Barrett, Hurt, Donahue & McLain, P.A., Orlando, FL, for defendant.

## ORDER

LAZZARA, District Judge.

This cause comes before the Court on Defendants Metropolitan Life Insurance Company and Home Depot U.S.A.'s Motion for Summary Judgment (dkt.32) and supporting memorandum and exhibits (dkt. 33 & 34) and Plaintiff James Earnest Jr.'s Memorandum in Opposition thereto (dkt.36).

## FACTUAL BACKGROUND

Plaintiff, James Earnest, Jr. ("Earnest"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA"). Plaintiff, a 61–year old male, was employed by Defendant Home Depot U.S.A., Inc. ("the Company") as a telephone sales person from 1990 until December 1, 1998, when he left his employment at the recommendation of his psychiatrist, Dr. Robert A. Buchholz ("Buchholz")[1] The Company provided its employees with a Home Depot Welfare Benefit Plan ("the Plan"), which included a component Long Term Disability ("LTD") Plan, which covered Earnest. (See LTD Policy, dkt. 34, Ex. A.) The Company is the Plan Sponsor and Plan Administrator, but it delegates all responsibilities for claims administration of LTD benefits to MetLife. (See dkt. 34, Ex. B, Certificate of Insurance, pp. 24–25.)

The Certificate of Insurance contains the following definition of disability:

"Disability" or "Disabled" means that, due to an Injury or Sickness, you require the regular care and attendance of a Doctor and:

1. You are unable to perform each of the material duties of your regular job or any gainful occupation on a full time basis, and

2. You, while unable to perform all of the material duties of your regular job or any gainful occupation on a full-time basis, are:

    a. performing one of the material duties of your regular job or any other gainful work or service on a part-time or full-time basis; and

    b. earning currently at least 20% less per month than your Indexed Basic Monthly Earnings due to that same Injury or Sickness.

(See Certificate, dkt. 34, Ex. B, p. 10.) The Plan provides for a 180–day waiting period. Earnest's first day of potential eligibility for LTD benefits was June 1, 1999. (See LTD Policy, dkt. 34, Ex. A.)

Earnest sought LTD benefits by a Statement of Claim dated May 10, 1999. (See A.R. 121–22.)[2] Earnest attached an Attending Physician Statement of Buchholz, who diagnosed Earnest with bipolar mood disorder and narcissistic personality disorder. (See id.) Buchholz concluded that Earnest was disabled from his own job indefinitely, but that Earnest was anticipated to be able to return to "any occupation" on June 1, 1999, and that Earnest was a candidate for vocational rehabilitation. (See id.) Buchholz's medical records show that he treated Earnest in 1997 and 1998 for mood swings, depression, marital problems caused by an extra-marital affair, and problems at work. (See A.R. 78–86.) Buchholz concluded on December 2,

---

1. The record shows that Earnest was also out of work much of 1998 due to knee replacement surgery.

2. Defendants provide the Administrative Record as Exhibits D & E to dkt. 34. The Court refers to Exhibits D & E collectively as "A.R." in citations throughout this Order.

1998, that Earnest needed "medical leave and short-term disability." (*See* A.R. 87.) However, in a December 15, 1998 letter, in connection with Earnest's earlier Short–Term Disability Claim[3], Buchholz limited the expected period of disability to "three to six months." (*See* A.R. 71.) Consistent with this limited period of disability, Buchholz's office note for April 29, 1999 states: "I informed him that I do not feel he will qualify for long term disability. I told him he needs to get back to work." (*See* A.R. 89.)

The Certificate of Insurance provides that MetLife has the right "while a claim is pending ... to have [a claimant] examined by Doctors of [MetLife's] choice when and as often as [MetLife may] reasonably choose." (*See* Certificate, dkt. 34, Ex. B at 18.) During the STD phase of Earnest's claim, MetLife had an independent psychiatric consultant, Dr. Ernest Gosline ("Gosline"), contact Buchholz and review the file. (*See* A.R. 57–62.) On April 29, 1999, Gosline reported, among other things, that Earnest's psychiatrist and psychologist "are assured that this man is tending to exaggerate his symptoms to the point that he is presenting himself sicker than he really is." (*See id.*) Gosline concluded, "there is medical documentation that this patient cannot return to his own job, but there is insufficient medical documentation at the present time that he cannot work at some other job commensurate with his skills, experience, background, and training." (*See id.*) Based on the information provided by Buchholz and Gosline's review, MetLife denied Earnest's claim on initial review on June 8, 1999, on grounds that he was not "disabled" as that term is defined in the Plan documents. (*See* A.R. 124–125.)

Through counsel, Earnest appealed the denial on June 18, 1999. (*See* A.R. 127.) MetLife agreed to hold the claim open until August 19, 1999 for Earnest's counsel to submit additional information. (*See* A.R. 133.) By letter dated August 19, 1999, Earnest's counsel submitted additional medical records and a memoranda regarding Earnest's claim for benefits. (*See* A.R. 134–208, 209–211, & 212–213.) Counsel contended that Earnest suffered neurological symptoms from an inappropriate combination of medication, including stuttering, dizziness, and tremors (*see* A.R. 211–212); memory difficulties or amnesia (*see* A.R. 210); Parkinson's disease (*see* A.R. 210); and various physical problems with his knees, including bilateral knee replacement (*see* A.R. 210).[4] In order to corroborate his claim of disability, counsel submitted the medical records of Earnest's psychologist Beverly Barbato ("Barbato"), from June 18, 1999, forward, which assert that Earnest is disabled by organic brain dysfunction and loss of cognitive function (*see* A.R. 134–143) and a psychiatric review technique form filled out by Barbato which asserts that Earnest is disabled from December 2, 1998, forward (*see* A.R. 144–146). She also offered Earnest's Social Security award as evidence of total disability. (*See* A.R. 233.) Evidently, on September 14, 1999, Earnest was found disabled, dating from December 2, 1998, and was awarded disability benefits by the So-

---

**3.** The STD claim is not at issue in this lawsuit, but the medical records for the period during which Earnest collected STD benefits are relevant to his claim for LTD benefits and were considered by MetLife in making the LTD benefits determination.

**4.** It is important to note that while some of these records address alleged physical disabilities, Earnest left work in December of 1998 at the recommendation of his psychiatrist, Buchholz, not because of any alleged physical problems, and Earnest did not reassert any claim to alleged physical disability in his later appeals.

cial Security Administration retroactive to that same date. (*See id.*)

However, the additional medical records submitted by Earnest in support of his claim for disability showed significant concerns by his treating physicians, Buchholz and Dr. Ivan Mazzorana ("Mazzorana"), a psychiatrist. (*See* A.R. 201, 204, 205, & 206.) Dr. David S. Geiser, a psychologist, conducted a psychological and neuropsychological assessment of Earnest "to rule out a memory or other cognitive disorder." (*See* A.R. 41.) He likewise concluded there was insufficient evidence of organic or neurological problems. (*See* A.R. 37.)

MetLife had Dr. David Turok ("Turok"), a board certified neurologist, review the file and on September 17, 1999, Turok similarly concluded that Barbato's conclusions of organic brain dysfunction were not substantiated. (*See* A.R. 217.) Turok added that Earnest's neurological condition is excellent and that there is no contra-indication to Earnest performing his occupation. (*See* A.R. 216–217.) He recommended a psychiatric evaluation. (*See id.*) With respect to Earnest's physical limitations, Turok concluded that Earnest may be limited in lifting, standing, walking for long periods of time, bending, and crouching. (*See id.*) He also stated that Earnest should not climb high areas nor operate in slippery environments due to his knee replacements. (*See id.*)[5]

Consistent with Turok's suggestion, MetLife advised Earnest's counsel on October 5, 1999, that an Independent Medical Examination ("IME") would be scheduled and that additional time was needed for the review. Plaintiff's counsel responded by asserting, on October 12, 1999, that an IME was not appropriate because she had already sent in a copy of the Social Security award and that pursuant to the Home

Depot Employee Handbook, such an award is evidence of disability. (*See* A.R. 241.) MetLife responded on October 13, 1999, that the section of the Handbook that references such an award was not part of the LTD coverage section, but rather, was part of the Home Depot retirement plan. (*See* A.R. 242.)

On November 30, 1999, MetLife notified Earnest that an IME had been arranged with Dr. Benjamin Barnea, a neuropsychiatrist, for December 9, 1999. (*See* A.R. 247–248.) On December 2, 1999, Earnest's counsel's office called MetLife and advised that Earnest was refusing to attend the IME because it was a two-hour drive away. (*See* A.R. 464.) MetLife was soon after advised by its IME vendor that there were no closer neuropsychiatrists available to perform the IME. (*See id.*) Based on all of the foregoing information, MetLife upheld its decision on appeal by letter dated December 3, 1999.

Earnest's counsel responded by writing letters to MetLife and the Company objecting to the denial. (*See* A.R. 270, 342–344.) In response, by letter dated December 28, 1999, MetLife reopened the claim for the scheduling of the IME. (*See* A.R. 272–273.) On January 10, 2000, MetLife advised Earnest's counsel that there were no closer neuropsychiatrists who performed IMEs and offered to pay for Earnest's transportation and lodging. (*See* A.R. 462.) Earnest's counsel then provided the name of Dr. Frederick Schaerf ("Schaerf"), a neuropsychiatrist practicing in Fort Myers, Florida. (*See* A. .R. 284, 461, & 462.) MetLife then had its IME vendor approve Schaerf's higher fee and arrange for the IME with Schaerf. (*See* A.R. 462.)

Schaerf conducted the IME on February 2, 2000, and indicated in his report a

---

**5.** Once again, it is important to note that Earnest's later appeals only addressed the issue of his alleged psychiatric or cognitive disabilities. He did not reassert a physical disability.

clear concern the Earnest was exaggerating his symptoms. (*See* A.R. 297.) He also disagreed with the opinion of Earnest's treating psychologist, Barbato, that Earnest is disabled by organic brain dysfunction and that Earnest has an amnestic disorder and concluded that these medical opinions were outside the realm of Barbato's expertise. (*See id.*) In addition, Schaerf noted that Earnest is already on Social Security Disability and that he has no interest in returning back to work. (*See* A.R. 295.) He added that, "I believe that this patient is trying to look like he is functioning at a much lower rate, but actually, if we could clarify some of the issues, he should be functioning, with regards to his bipolar illness, at a level of 80 ... it is clear to me that the patient is euthymic with normal mood, energy, and appetite." (*See* A.R. 296.) He recommended neuropsychological testing, including "forced-question" testing, by Dr. John Newman. (*See* A.R. 295–296.) Based on this information, including Schaerf's evaluation, MetLife upheld the denial of benefits on March 24, 2000. (*See* A.R. 313–315.)

By letter dated May 22, 2000, Earnest's counsel asserted to MetLife, in an effort to have the appeal decision overturned, that it was clear that Schaerf's findings were not conclusive and that he recommended neuropsychological testing. (*See* A.R. 328) The letter also advised that the objective testing had recently been arranged and performed by Earnest's own treating psychologist, Barbato. (*See id.*) Barbato's report concluded that Earnest has "organic brain syndrome caused by the improper combination of the prescription medications Redux and Imitrex simultaneously in 1997 and 1998; has significant cognitive impairments caused by this organic brain damage; and concluded that Earnest would continue to decline." (*See* A.R. 346–349.)

MetLife referred this new information to a nurse consultant, K. Miller, R.N. ("Miller"), for consideration. Miller concluded that Barbato was not qualified to make a medical diagnosis of a neurological disorder and suggested further review by MetLife's independent physician, Gosline. (*See* A.R. 455.) Gosline reviewed Barbato's report and on June 2, 2000, concluded: (a) Barbato did a neuropsychological battery of tests but did not do the "forced question" psychological testing recommended by Schaerf; (b) Barbato does not provide raw data; (c) Barbato's report failed to provide sufficient justification for the alleged connection between prior medication use and alleged organic brain damage; and (d) that there was excessive conjecture in Barbato's report which did not appear to be based on actual testing. (*See* A.R. 332–333.) MetLife then advised Earnest's counsel that two full and fair reviews provided by the Plan's terms had already been completed. (*See* A.R. 339.)

Earnest then sought review of MetLife's decision by Defendant Home Depot ("the Company"). (*See* A.R. 350–351, & 354.) On July 18, 1000, the Company responded by requesting MetLife to reopen the case and to assess the new information from Barbato. (*See* A.R. 355.) MetLife then advised Barbato to provide copies of her "office testing" data on July 24, 2000. (*See* A.R. 358.) MetLife made a second request for this data on August 14, 2000. (*See* A.R. 361.) On August 18, 2000, Barbato refused to release the raw test data unless MetLife provided information about the "licensed professional who will review the test data." (*See* A.R. 363.) In response, MetLife asked Dr. John Shallcross, a consulting psychologist, to contact Barbato, provide his qualifications, and obtain copies of her raw data. (*See* A.R. 369–370.) However, on September 19, 2000, Shallcross advised that he believed it was more advisable for an IME to be conducted by

Dr. Newman ("Newman"), as recommended in Schaerf's IME report. (*See id.*)

MetLife then scheduled an IME by Newman, a clinical psychologist, for October 24, 2000, and so advised Earnest by letter dated October 4, 2000. (*See* A.R. 376–377.) On October 10, 2000, Earnest's counsel objected to having Newman conduct an IME because he worked with Schaerf and then cancelled the exam. (*See* A.R. 386.) In an effort to accommodate Earnest' counsel's objections, MetLife agreed to obtain the IME from someone other that Newman. (*See* A.R. 446–447.) MetLife then scheduled an IME with Dr. Silver, a clinical psychologist, and advised Earnest of the IME on October 31, 2000. (*See* A.R. 389.)

On November 8, 2000, Earnest's counsel responded with a demand that MetLife resolve the claim only by addressing questions to Barbato. (*See* A.R. 394–395.) In a phone conference with MetLife on November 14, 2000, Barbato again reiterated her demand. (*See* A.R. 445.) By letter dated November 15, 2000, she reiterated the demand yet again. (*See* A.R. 396.) In response, MetLife referred the matter back to Shallcross for peer review and discussions with Barbato. (*See* A.R. 404–405.) After speaking with Barbato, Shallcross concluded, in his report dated November 27, 2000, that the battery of neuropsychological instruments given to Earnest by Geiser was more inclusive than that given by Barbato; that "the documentation is more supportive of an affective disorder than of a cognitive disorder;" and he recommended an additional neuropsychological evaluation to be done by Newman or another neuropsychologist. (*See* A.R. 406–411.) In a follow up report requested by MetLife, Shallcross concluded on December 18, 2000, that Earnest appears to be malingering, that he lacks motivation, and does not appear to be grossly impaired neurop-

sychologically. (*See* A.R. 434.) He also concurred with Schaerf that Earnest probably could return to work, but would not be willing to do so and would probably decompensate if he did. (*See id.*)

MetLife then referred the file to Gosline for another review. (*See* A.R. 422–423.) Gosline reiterated his earlier conclusions, recommended "a battery of psychological tests which would included such projective tests as Rorschach, the TAT Bender–Gestalt possibly and other projective personality tests, and also recommended referring the matter back to Shallcross for more input on that matter." (*See* A.R. 425–426.) Because Earnest had already rejected further IMEs, MetLife went ahead and upheld its denial of Earnest's claim on January 3, 2001, basing its decision on the conclusions of Schaerf, Shallcross, Gosline, as well as the medical records and other evidence in the record. (*See* A.R. 428–432.)

### PLAINTIFF'S CLAIMS

Earnest now sues the Company and MetLife to recover LTD benefits denied to him under the Plan, as well as fees and costs. He contends that at all times he has been "totally disabled" within the meaning of the Plan's terms. Earnest contends that Defendants failed to provided a full and fair review, as required by 29 U.S.C. § 1133, and failed to follow claims procedure regulations set out in 29 C.F.R. § 2560.503–1. He adds that Defendant's interpretation of the Plan provisions was erroneous. Earnest also argues that Defendants operated under a conflict of interest, that they abused their discretion, and breached their contract with him.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). Where the rec-

ord taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted). On a motion for summary judgment, the court must review the record, and all its inferences, in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Having done so, the Court now finds that Defendants are entitled to the entry of final summary judgment in their favor. The subject LTD plan gives MetLife discretion to determine eligibility for LTD benefits. The administrative record clearly shows that MetLife's denial of said benefits was both correct and reasonable.

### STANDARD OF REVIEW

■ There is no dispute that the subject Plan is an employee welfare benefit plan governed by ERISA. Where plan documents grant discretion to the plan administrator to interpret the terms of the plan and to determine eligibility for plan benefits, the standard of review is whether the plan administrator abused its discretion or the decision was arbitrary and capricious. *See HCA Health Serv. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 992 (11th Cir.2001) (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The Eleventh Circuit has modified this arbitrary and capricious standard in cases in which the claims administrator was acting under a conflict of interest. *See HCA Health Serv.,* 240 F.3d at 993 (citing *Florence Nightingale Nursing Serv. Inc. v. Blue Cross/Blue Shield,* 41 F.3d 1476, 1481 (11th Cir.1995)). The modified standard is called the "heightened" arbitrary and capricious standard. *See Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1325–26 (11th Cir.

2001); *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1563–64 (11th Cir.1990) (noting that heightened standard "must be contextually tailored" to case). The Eleventh Circuit recently held that where a conflict of interest exists, an ERISA plan administrator's decision to deny benefits is to be reviewed under the heightened arbitrary and capricious standard regardless of whether the decision turns on findings of fact or on interpretations of plan terminology. *See Torres v. Pittston Co.,* 346 F.3d 1324, 1334–35 (11th Cir.2003).

■ Once the court determines whether the plan documents grant discretion to the claims administrator to interpret the terms, then the court must apply at the very least the arbitrary and capricious standard and possibly the heightened arbitrary and capricious review. *See HCA Health Serv.,* 240 F.3d at 993. "Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies, the court evaluates the claims administrator's interpretation of the plan to determine whether it is 'wrong.'" *See id.* An administrator's decision is deemed "wrong" when the court disagrees with the claims administrator's plan interpretation after a de novo review of the plan documents and disputed terms. *See id.* at n. 23. If the court disagrees with the decision and thus finds it "wrong," then the court next decides whether "the claimant has proposed a 'reasonable' interpretation of the plan." *See id.* at 994 (quoting *Lee v. Blue Cross/Blue Shield,* 10 F.3d 1547, 1550 (11th Cir.1994)).

■ Even if the claimant's proposed interpretation is reasonable, the court must still determine whether the claims administrator's "wrong" interpretation is reasonable. At this point, the court must gauge the self interest of the claims administrator. *See HCA Health Serv.,* 240

F.3d at 994. The claims administrator satisfies the burden by showing that its "wrong but reasonable" plan benefits the class of participants and beneficiaries. *See id.* at 995. Even if the claims administrator accomplishes this task, "the claimant may still be successful if he can show by other measures that the administrator's decision was arbitrary and capricious." *See id.* If it cannot be shown that the participants and beneficiaries of the plan are benefitted, then the claims administrator's plan interpretation is not entitled to deference.

### DISCUSSION

▬▬ Here, both the Certificate of Insurance for the group LTD policy and the Home Depot Summary Plan Description expressly assign Plan interpretation and claims decision-making authority to MetLife. (*See* dkt. 33, Ex. 1, pp. 24–25 & p. 95.) Thus, this Court must conduct a de novo review of whether the interpretation was "wrong." If this Court determines that the interpretation was "wrong," and thereafter is not reasonable, next the Court looks at whether a conflict of interest exists. When the plan fiduciary making the benefits decision is also the insurance company responsible for paying the claims, as is MetLife in this case, the heightened arbitrary and capricious standard is applicable.

### MetLife's Interpretation of the Plan

▬▬ Based on a de novo review of the information before MetLife, this Court simply cannot find that MetLife's decision to deny LTD benefits was "wrong." The record consists of a plethora of evidence which not only supports the denial of benefits, but well documents the extraordinary patience and accommodations made on the part of MetLife with respect to Earnest.

MetLife initially denied Earnest's claim on June 8, 1999. (*See* A.R. 124–125.) The decision was correct in light of the opinion

of Dr. Buchholz that Earnest could return to "any occupation" by June 1, 1999, and a review by independent psychiatric consultant, Dr. Gosline, who, based on his review of the medical records and discussions with Earnest' treating psychiatrist and psychologist, concluded that Earnest was exaggerating his symptoms. (*See* A.R. 57–62.)

Earnest appealed the denial of his claim, submitting voluminous medical documentation. (*See* A.R. 127 & 134–213.) However, much of this documentation shows significant concerns by Earnest's own treating physicians about his exaggeration of his symptoms. Buchholz, who had treated Earnest for 18 months before expressing his opinion, expressed doubt about Earnest's claims of memory loss and informed Earnest that he would probably not qualify for long-term disability. (*See* A.R. 63, 89–90.) Mazzorana, a psychiatrist who treated Earnest during his psychiatric hospitalization in February 1999, found no evidence of the memory problems claimed by Earnest and concluded that Earnest's alleged loss of memory was "mostly a fabrication in the setting of spending time with another individual." (*See* A.R. 204–206.) During this same hospitalization, Mazzorana and Dr. Geiser, a psychologist, concluded there were no memory problems and no evidence of organic brain damage. (*See* A.R. 37–41 & 204–206.) Dr. Turok, a board certified neurologist conducting an independent physician review for MetLife, specifically rejected Dr. Barbato's conclusions of organic brain dysfunction and found that Earnest's neurological condition was excellent. (*See* A.R. 216–217.) MetLife scheduled an IME by an independent neuropsychiatrist to further assess these issues, but Earnest refused to attend. (*See* A.R. 247–48 & 464.) Based on this new information, as well as the information considered in the first denial, MetLife properly denied Earnest's claim on the first appeal, and advised Earnest that the

Plan's two full and fair reviews had been completed. (*See* A.R. 276–279.)

██ Even though the Plan only provides for one appeal, MetLife allowed a second appeal by Earnest. (*See* A.R. 280–281.) To accommodate Earnest's counsel, MetLife even agreed to an IME by Dr. Schaerf, a neuropsychiatrist suggested by Earnest's counsel, incurring additional costs as a result. (*See* A.R. 462.) Schaerf found that Earnest's treating psychologist, Barbato, was not qualified to diagnose organic brain damage and concluded that Earnest did not have organic brain damage or an amnestic disorder. (*See* A.R. 297.) He further concluded that Earnest "is not a reliable informant," "has feigned amnestic episodes and fugue states," and that further neuropsychological testing would reveal, "with a high degree of medical certainty," that "the patient is attempting to look much more impaired than he really is." (*See* A.R. 295–297.) He also concluded that Earnest was capable of working, but did not want to. (*See* A.R. 295.) Based on Schaerf's IME report, and the other information considered in the initial review and first appeal, MetLife properly denied Earnest's claim on this second appeal. (*See* A.R. 313–315.)

██ Plaintiff sought yet a third appeal based on a new report by Barbato concluding that he is disabled by organic brain damage. (*See* A.R. 328, 346–349.) By this time, however, MetLife had already received the opinions of Turok, a neurologist, and Schaerf, the IME neuropsychiatrist selected by Earnest's counsel, disputing Barbato's conclusions. (*See* A.R. 217 & 297.) Nevertheless, MetLife once again had Dr. Gosline review the file and he concluded that Barbato's report failed to provide the supporting raw data, failed to provide sufficient evidence of organic brain damage, and was based on excessive conjecture. (*See* A.R. 332–333.) MetLife also allowed the third appeal and scheduled an IME for psychological testing. (*See* A.R. 376.) Earnest's counsel objected to the proposed IME psychologist, Dr. Newman, even though he was suggested by Schaerf, the neuropsychiatrist suggested by Earnest's counsel in the first place. (*See* A.R. 380 & 386.) MetLife then agreed to have the IME conducted by a different psychologist, Dr. Silver (*see* A.R. 389 & 446–447), but Earnest's counsel rejected this proposed IME and insisted that MetLife make its determination based solely upon Barbato's report (*see* A.R. 394–396). However, as the Supreme court recently held in *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 123 S.Ct. 1965, 1970, 155 L.Ed.2d 1034 (2003), "nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."

MetLife next obtained a peer review from independent consulting psychologist, Dr. Shallcross, who concluded that Earnest "does appear to have been malingering," "does appear to lack motivation," and could return to work. (*See* A.R. 434.) He rejected Barbato's conclusion of organic brain damage, opined that Earnest "does not appear to be grossly impaired neurologically," and opined that Earnest's disorder was more likely "affective" rather than "cognitive." (*See* A.R. 406.) MetLife correctly denied the third appeal based on Shallcross's report and the prior information in the record. (*See* A.R. 428–432.) To conclude, after conducting a de novo review of the Plan terms and the record, the Court finds that MetLife's decision to deny Earnest LTD benefits was not wrong.

### *Home Depot is not a Proper Party Defendant*

██ As previously discussed, the undisputed facts show that MetLife insures

the LTD benefits under the Plan and that Home Depot, the Company, delegated full discretionary authority to MetLife as claims administrator to determine all claims and appeals for LTD benefits. Therefore, the Company is not a proper party Defendant to this ERISA benefits action. *See Garren v. John Hancock Mutual Life Ins. Co.*, 114 F.3d 186, 187 (11th Cir.1997); *Henderson v. Transamerica Occidental Life Ins. Co.*, 120 F.Supp.2d 1278, 1281–82 (M.D.Ala.2000); *Hunter v. Metropolitan Life Ins. Co.*, 251 F.Supp.2d 107 (D.D.C.2003).

**ACCORDINGLY,** it is **ORDERED AND ADJUDGED:**

Defendants Metropolitan Life Insurance Company and Home Depot U.S.A.'s Motion for Summary Judgment (dkt.32) is granted. The Clerk shall enter final summary judgment for Defendants, terminate all pending motions, and close this case.