Kathleen **BUONINCONTRI**, Plaintiff.

v.

**LIBERTY LIFE ASSURANCE COMPANY OF BOSTON,**
Defendant.

No. 8:04CV02187–EAJ–TBM.

United States District Court,
M.D. Florida.
Tampa Division.

March 10, 2006.

---

William Francis Rutger, William Rutger, Attorney at Law, Palm Harbor, FL, for Plaintiff.

Ernest J. Myers, Lee W. Marcus, Marcus, McMahon & Myers, PL, Orlando, FL, for Defendant.

## ORDER

KOVACHEVICH, District Judge.

This cause comes before the Court on the Defendant's Motion for Summary Judgment filed June 30, 2005 (Doc. 15); the Affidavit in support of Defendant's Motion for Summary Judgment filed June 30, 2005 (Doc. 16); and Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment filed July 27, 2005 (Doc. 19).

Upon review of the motion and affidavit, and the response thereto. this Court finds that Defendant's Motion for Summary Judgment is **GRANTED**.

### I. Procedural History

For the purpose of ruling on the motions for summary judgment, this Court accepts the following facts as true.

Plaintiff, Kathleen Buonincontri ("Buonincontri"), initiated this action, seeking short-term disability ("STD") and long-term disability ("LTD") benefits under her former employer, Tech Data Corporation's ("Tech Data"), employee benefit plans. Buonincontri was hired by Tech Data on December 15, 1997. Tech Data's STD and LTD benefit plans are governed by 29 U.S.C. § 1001. *et. seq.*, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Buonincontri became eligible for STD benefits as of June 15, 1998. However, she did not immediately enroll in the contributory LTD benefit plan.

Defendant, Liberty Life Assurance Company of Boston ("Liberty Life"), did not insure the STD plan, but did administer the STD claims for Tech Data. Liberty Life insured the LTD plan for Tech Data. pursuant to a Group Disability Income policy, number GF3–850–279979–01 ("the Policy"). Pursuant to the terms of the Policy and the LTD plan, Liberty Life had discretionary authority to make interpretations and to determine eligibility for benefits.[1]

On September 16, 2002, Buonincontri saw her physician, Dr. Mehta. and complained that she was very stressed, depressed, and was experiencing heart palpitations. Dr. Mehta diagnosed Buonincontri as suffering from anxiety and depression.

On September 20, 2002, Buonincontri telephonically reported her STD claim to Liberty Life. At that time, she reported she had been out of work since September 17, 2002, and Dr. Mehta had given her a note to remain out of work for 6 weeks. Plaintiff's STD claim was approved as of September 17, 2002.

On November 6, 2002, Buonincontri saw her orthopedic surgeon. Dr. John Shim. At that time, she complained of intermittent discomfort and severe increasing pain in her neck. The radiographic views taken that day showed a minor instability at C4–C5 on flexion and extension. On November 18, 2002, Buonincontri had an MRI of her cervical spine which showed a C6–C7 left paracentral disc protrusion.

On December 5, 2002, Buonincontri returned to Dr. Shim. At that time, he noted that she had a disc herniation at C6–C7. Accordingly, Dr. Shim scheduled Buonincontri for a surgical discectomy at C6–C7.

---

1. The Policy states that Liberty Life "shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction for the terms of this policy and benefit eligibility shall be conclusive and binding." (Doc. 16, A.R.34).

Dr. Shim also noted that at the C4–C5 level there was evidence of some mild spondylosis. During the December 5th office visit, he discussed with Buonincontri that she might develop trans-junctional instability and further degeneration at the C4–C5 level in the future.

Following this office visit, Buonincontri reported to Liberty Life that she was suffering from a herniated disc in her neck which required surgery. She also advised Liberty Life that Dr. Shim ordered her to discontinue work until after surgery.

Dr. Shim performed spinal decompression and fusion surgery on Buonincontri on January 28, 2003. As she remained disabled following her surgery. Liberty Life extended Buonincontri all STD benefits through the maximum duration date of March 17, 2003.[2] On March 13, 2003, anticipating the exhaustion of Buonincontri's STD benefits, Liberty Life initially approved her for LTD benefits.

On March 12, 2003, Tyrone Dixon, P.A.-C. Dr. Shim's physician's assistant, released Buonincontri to return to work. However, at that time. Tech Data did not have a position for her, so she requested and received a thirty-day administrative leave to enable her to apply for positions within the company. Thus, Buonincontri was not actually at work on the day immediately preceding her leave of absence.

On April 14, 2004, while Buonincontri was on her leave of absence. P.A. Dixon ordered that Buonincontri stay out of work due to worsened symptoms of left-sided neck pain with muscle spasms and upper left extremity discomfort following her cervical discectomy and fusion at C6–7. On April 25, 2003, Dr. Shim restricted her from work for an additional 3 weeks. Throughout the next several months. Dr. Shim continued to restrict Buonincontri from working due to neck pain and upper extremity pain and parethesis. Throughout this time, Liberty Life paid LTD benefits to Buonincontri.

In October 2003, Tech Data advised Liberty Life that Buonincontri did not elect to participate in the LTD Plan until the November 2002 open enrollment period, and thus, had no LTD coverage until January 1, 2003.[3] Accordingly, as Buonincontri's disability predated the effective date of her LTD benefits. Liberty Life terminated her LTD benefits by letter dated October 29, 2003. However, even though Liberty Life paid Buonincontri LTD benefits through October 7, 2003, Liberty Life did not request reimbursement for the benefits paid inadvertently on her claim.

Buonincontri timely requested an appeal of the termination of her benefits. After reviewing the facts of the claim and Buonincontri's LTD coverage under the Policy. Liberty Life affirmed the decision to terminate Buonincontri's LTD benefits by letter dated November 18, 2003.

On February 23, 2004, Buonincontri sent a letter to Liberty Life contending that the March 12, 2003 return to work should have been considered as a new disability onset date.[4] In response thereto, on March 1,

---

2. The Plan provided STD benefits for 180 days, making the maximum duration date for Buonincontri's STD benefits March 17, 2003. (Doc. 16, A.R.55, 206).

3. Buonincontri was advised of the 2003 open enrollment period by a document dated November 1, 2002. (Doc. 16, A.R.74). By the terms of the Policy, the effective date for the added coverage would be the next policy anniversary date, which was January 1, 2003. (Doc. 16. A.R. 12; A.R. 1).

4. Buonincontri's letter contends that March 12, 2003 should be the new disability onset date, but from the context of the letter it appears that she meant that April 14, 2003 (the date that P.A. Dixon ordered her to stay out of work) should be the new disability onset date. (*See* Doc. 16, A.R. 60).

2004, Liberty Life again contacted Tech Data. Liberty Life was advised that Buonincontri was on disability from September 17, 2002 through March 18, 2003. Liberty Life was further advised that Buonincontri was on administrative leave from March 18, 2003 until she was terminated on April 15, 2003. Accordingly, on March 1, 2004, Liberty Life sent a letter to Buonincontri explaining that her claim was denied and her administrative right to a review had been exhausted. This law suit followed.

On June 30, 2005, Liberty Life moved for summary judgment. In support of its motion, Liberty Life relies on the Affidavit of Paula McGee (Doc. 16), which authenticates and attaches the Policy and the documents constituting the Administrative Record. Liberty Life contends that Buonincontri exhausted her STD benefits in their entirety, and that Liberty Life's decision to terminate Buonincontri's LTD benefits was correct on three grounds. First, Liberty Life argues that Buonincontri's disability began before her LTD benefits were effective. Second, Liberty Life argues that even if the March/April 2003 date she was taken off work by P.A. Dixon was a new date of disability, that disability was based on a pre-existing condition and was excluded from coverage. Finally, Liberty Life argues that due to the Delayed Effective Date for Insurance provision of the Policy, Buonincontri's LTD benefits never became available to her, since she did not return to work any time·after her enrollment for the LTD benefits.

On July 27, 2005, Buonincontri filed a response to Liberty Life's motion for summary judgment. She contends that Liberty Life's decision to terminate her LTD benefits was wrong on two grounds. First, Buonincontri argues that her disability in December 2002 was due to a herniation at C6–C7, but that condition was resolved by the January 2003 surgery.

Accordingly, she contends, the neck and arm pain which caused her to be taken off work in April 2003 had nothing to do with the C6–C7 herniation which was repaired. Second, Buonincontri argues that Liberty Life waived the Delayed Effective Date for Insurance provision by accepting her under the Open Enrollment for Employees on Leave of Absence.

## II. Standard of Review

### A. Summary Judgment Standard of Review

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure, if the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Courts may render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." support the finding that there is no genuine issue of material fact. Fed.R.Civ.P. 56(c). Additionally, summary judgment is appropriate where a party fails to make a "sufficient showing" to establish the existence of an element that is essential to that party's case, and where that party has the burden to prove the existence of that element. *Celotex Corp. v. Catrett,* 477 U.S. at 322–333, 106 S.Ct. 2548, 91 L.Ed.2d 265.

The moving party bears the initial burden of showing support for its motion for summary judgment. *Id.* at 323, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. The burden then shifts to the nonmoving party to go "beyond the pleadings" to show that a genuine issue of material fact does exist and that they can establish the essential element. *Id.* at 324, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. *See also Hilburn v. Murata Electronics North Amer-*

*ica, Inc.,* 181 F.3d 1220, 1225 (11th Cir. 1999). A material fact is one which "might affect the outcome of the suit under the governing law." and a genuine issue exists where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, in deciding a motion for summary judgment, courts must construe the evidence in a "light most favorable to the non-moving party." *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d at 1225.

### B. ERISA Standard of Review

 A participant or beneficiary of an employee benefit plan is allowed to bring a civil cause of action to seek the recovery of benefits that have been denied pursuant to 29 U.S.C. § 1132(a)(1)(B). The ERISA statute is silent as to the standard for review to be applied when reviewing an administrator's decision to deny benefits. *Firestone Tire & Rubber Co., v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, in *Firestone,* the Supreme Court announced several standards that courts may apply when reviewing such decisions. *Id.* at 115, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80. Borrowing from principles of trust law, the Supreme Court announced that in an action arising under 29 U.S.C. § 1132(a)(1)(B), courts should apply the *de novo* standard of review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id. See also Lee v. Blue Cross/Blue Shield of Alabama,* 10 F.3d 1547, 1549 (11th Cir.1994). If, however, the administrator or fiduciary is given discretionary authority, the "arbitrary and capricious" standard is the appropriate standard of review. *HCA Health Ser-*

*vices of Georgia, Inc., v. Employers Health Insurance Co.,* 240 F.3d 982, 992 (11th Cir.2001). Under the arbitrary and capricious standard, the court will determine whether there was a "reasonable basis" for the administrator's decision "based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Alabama,* 890 F.2d 1137, 1139 (11th Cir.1989)(citing *Brown v. Retirement Committee of Briggs & Stratton Retirement Plan,* 797 F.2d 521, 532 (7th Cir.1986); *Denton v. First National Bank of Waco, Texas,* 765 F.2d 1295, 1304 (5th Cir.1985); *Berry v. Ciba–Geigy Corp.,* 761 F.2d 1003, 1007 (4th Cir. 1985)).

 However, in *Firestone,* the Supreme Court noted that where the "administrator or fiduciary is acting under a possible or actual conflict of interest," the "conflict must be weighed as a facto[r] in determining whether there is an abuse of discretion." *Firestone,* 489 U.S. at 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (citing Restatement (Second) of Trusts § 187, Comment *d* (1959)). *See also Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1561 (11th Cir.1990). This has been referred to as the "heightened" arbitrary and capricious standard. *Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1325–1326 (11th Cir.2001). Under this standard, "the burden shifts to the [administrator] to prove that its interpretation of the plan provisions committed to its discretion was not tainted by self interest." *HCA Health Services of Georgia, Inc., v. Employers Health Insurance Co.,* 240 F.3d at 993 (11th Cir.2001)(quoting *Brown v. Blue Cross & Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1566 (11th Cir.1990)).

Thus, the Eleventh Circuit has adopted the following standards for review: "(1) *de novo,* applicable where the plan adminis-

trator is not afforded discretion, (2) arbitrary and capricious when the plan grants the administrator discretion, and (3) heightened arbitrary and capricious where there is a conflict of interest." *Paramore v. Delta Air Lines, Inc.*, 129 F.3d 1446, 1449–50 (11th Cir.1997)(citing *Buckley v. Metropolitan Life*, 115 F.3d 936, 939 (11th Cir.1997)).

### C. Application of ERSIA Standard of Review

In the instant case, the record reflects that the Plan and Policy give Liberty Life discretion to interpret terms of the Policy and make decisions regarding benefit claims. Specifically, the Policy states that Liberty Life:

> shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Liberty's decisions regarding construction for the terms of this policy and benefit eligibility shall be conclusive and binding. (Doc. 16, A.R.34).

Therefore, because the Plan and Policy grant Liberty Life discretion, the *de novo* standard will not apply. Rather, this Court must "apply at the very least the arbitrary and capricious standard and possibly the heightened arbitrary and capricious review." *Earnest v. Metropolitan Life Insurance Company*, 291 F.Supp.2d 1327, 1335 (M.D.Fla.2003).

■■■■ A conflict of interest exists when the administrator or fiduciary has the authority to make discretionary decisions, and is, at the same time, also responsible for paying out claims from its own assets. *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d at 1562 (citing *Jader v. Principal Mutual Life Ins. Co.*,

723 F.Supp. 1338, 1343 (D.Minn.1989)). *See also Grayer v. Liberty Life Assur., Co. of Boston*, 331 F.Supp.2d 1383, 1389 (M.D.Fla.2004)(applying the heightened arbitrary and capricious standard where the insurance company was granted discretionary authority in decision making and paid claims out of its own assets). The record reflects that, with respect to the STD benefits. Liberty Life acts as the administrator and determines whether or not to grant or deny benefits, but does not pay for the benefits out of its own assets. However, with respect to the LTD benefits, Liberty Life acts as the administrator and determines whether or not to grant or deny benefits, and Liberty Life also insures the Plan. Thus, it appears that Liberty Life does have an inherent conflict of interest with respect to the determination of LTD benefits, and this Court finds that the heightened arbitrary and capricious standard is appropriate.[5] However, "this Court is not required to consider the fiduciary's self-interest unless the Court concludes the benefit determination was wrong." *Grayer v. Liberty Life Assur. Co.*, 331 F.Supp.2d at 1390.

### III. DISCUSSION

■■■ "Regardless of whether arbitrary and capricious or heightened arbitrary and capricious review applies," the first step of the analysis is to determine whether or not the administrator's interpretation of the plan was wrong. *HCA Health Services of Georgia, Inc., v. Employers Health Insurance Co.*, 240 F.3d at 993. *See also Brown v. BellSouth Telecommunications Inc.*, 73 F.Supp.2d 1308, 1319 (M.D.Fla.1999). This decision must first be made, before the court also considers any self interest

---

**5.** The heightened arbitrary and capricious standard is not appropriate with respect to Buonincontri's claim for STD benefits. However, there is no opposition to Liberty Life's

motion for summary judgment regarding the STD benefits, as the record is clear that the STD benefits were fully paid to Buonincontri until exhaustion. *See infra.*

on part of the administrator. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d at 1326.

### A. Claim for STD Benefits

 In her complaint, Buonincontri sets forth a claim for STD benefits as well as a claim for LTD benefits. The administrative record is clear that Liberty Life, approved Buonincontri's claim for STD benefits as of September 17, 2002. Liberty Life extended Buonincontri's STD benefits to the maximum benefit duration date of March 17, 2003.

These facts were not controverted in Buonincontri's response to Liberty Life's motion for summary judgment, and they were not controverted at oral argument. Accordingly, this Court holds that Buonincontri was paid all STD benefits to which she was due, and Liberty Life is entitled to summary judgment on Buonincontri's claim for STD benefits.

### B. Claim for LTD Benefits

#### 1. Liberty Life's Interpretation of the Plan

 The plan administrator's decision will be considered "wrong" when, "after a *de novo* review of the plan documents and disputed terms," the court disagrees with the administrator's interpretation of the plan. *Earnest v. Metropolitan Life Insurance Company*, 291 F.Supp.2d at 1335. In determining whether the administrator acted reasonably in interpreting the plan, courts may "look only to the facts known to the administrator at the time the decision was made" to deny the claim. *Pittard v. Watkins Associated Industries, Inc.*, 990 F.Supp. 1444, 1453 (N.D.Ga.1997)(citing *Lee v. Blue Cross/ Blue Shield of Alabama*, 10 F.3d at 1550).

If, after this review, the court concludes that the decision was not wrong, the analysis ends there and summary judgment should be awarded in favor of the administrator. *Hagberg v. Liberty Life Assur. Co. of Boston*, 321 F.Supp.2d 1270, 1272 (N.D.Fla.2004). However, if the court concludes that the decision was "wrong," then it must look to see if the claimant has "proposed a reasonable interpretation of the plan," followed by a determination of whether the administrator's decision is still considered reasonable. *Earnest v. Metropolitan Life Insurance Company*, 291 F.Supp.2d at 1335(referring to *HCA Health Services of Georgia, Inc., v. Employers Health Insurance Co.*, 240 F.3d at 993).

#### a) Terms of the Plan

 In assessing whether Liberty Life reasonably interpreted the Plan, the Court will first look to the plain language of the terms. *See Luton v. Prudential Insurance Company of America*, 88 F.Supp.2d 1364, 1370–1371 (S.D.Fla.2000).

With respect to the payment of LTD benefits, the Policy provides:

### LONG TERM DISABILITY COVERAGE

**Disability Benefit**

When Liberty receives Proof that a Covered Person [6] is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician. Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy. . . .

. . . . .

---

**6.** "Covered Person": is defined by the Policy as "an Employee *insured* under this policy."

(Doc. 16, A.R. 6, emphasis added).

For purposes of determining Disability, the Injury must occur and *Disability must begin while the Employee is insured for this coverage....*

(Doc. 16, A.R. 16, emphasis added).

It is undisputed that Plaintiff first enrolled in the LTD plan during the open enrollment period at the end of 2002. With respect to the effective date of coverage, the Policy provides:

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows ...

2. For Contributory Coverage Applied for During Annual Enrollment Periods

An Employee will be insured for the selected contributory coverage on the first day of the next policy anniversary.

(Doc. 16, A.R.12).

The Effective Date of the Policy is January 1, 2002. (Doc. 16, A.R.1). Accordingly, the first day of each policy anniversary is January 1. Thus, the earliest date that Buonincontri was insured for LTD benefits under the Policy would have been January 1, 2003.

However, the Policy also provides:

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

(Doc 16, A.R. 13).

Pursuant to the definitions of the Policy:

**"Active Employment"** means the Employee must be actively at work for the Sponsor:

1. on a full-time basis and paid regular earnings;

2. for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

 a. at the Sponsor's usual place of business; or

 b. at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

. . . . .

5. an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay off); ...

(Doc. 16, A.R.5).

Finally, with respect to pre-existing conditions, the Policy provides:

**Pre–Existing Condition Exclusion(s)**

This policy will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from a Pre–Existing Condition; and

2. which begins in the first 12 months immediately after the Covered Person's effective date of coverage.

**"Pre–Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage. (Doc. 16.A.R.29).

This Court does not find that the above terms of the Policy are ambiguous. Accordingly, the Court must next consider Liberty Life's arguments that these terms

result in a lack of coverage for Buonincontri's LTD claim.

#### b) *Analysis*

Each of Liberty Life's arguments will be examined in turn, along with Buonincontri's responses.

##### i) *Disability Started Before Buonincontri Became Insured*

■ Liberty Life argues that Buonincontri was not entitled to any LTD benefits, because her disability started before she became insured. The Policy clearly states that to be entitled to benefits, the "[d]isability must begin while the Employee is insured for this coverage." Viewing the facts in the light most favorable to Buonincontri, the very earliest she could have been insured for LTD coverage was January 1, 2003. However, as of December 5, 2002, Dr. Shim relieved her from work due to her neck pain caused by the herniated disc. In the simplest terms, Buonincontri couldn't work because she had neck pain, and pain and parethesis radiating to her upper extremities. Throughout 2003, Dr. Shim continued to certify that Buonincontri was disabled due to neck pain, and pain and parethesis radiating to her upper extremities. This disability began in December 2002, before Buonincontri became an insured for LTD benefits.

Buonincontri contends that the C6–C7 disc herniation and related symptomology were resolved by the January 2003 surgery, and the subsequent neck pain, and pain and parethesis radiating to her upper extremities were caused by a herniation in a different cervical disc. Buonincontri directs the Court to Dr. Spiegel's records, which, in August 2003, indicate that Buonincontri has a cervical disc herniation at the C4–C5 level. Thus, concludes Buonincontri, when she was relieved from work on her doctor's orders in April 2003, she was disabled due to a C4–C5 herniation which was different from her disability from the C6–C7 herniation that started in December 2002.

Buonincontri's arguments regarding this issue are rejected for two reasons. First, Buonincontri's disabling condition was her neck pain and other radiating cervical symptoms. Whether the pain impulses started at C6–C7 or C4–C5. Buonincontri had pain in her neck which prevented her from working. A review of her medical records as a whole demonstrate that once the surgery was completed, she became increasingly aware of additional pain in her neck. This was a continuing disabling problem, not two separate disabilities. The precise cause of the disabling neck condition may have changed over time, but the disabling neck condition existed in December 2002 and continued through 2003.

Second, in Dr. Spiegel's August 1, 2003 office note, he clearly states:

> The patient denies any instigating cause for this latter herniated disc. She denies any accidents.

If Buonincontri had a good surgical result in January 2003 with no residual neck problems, and then fell down a flight of stairs or was injured in a car accident or suffered some other acute trauma which caused the C4–C5 herniation, then her contention that the two herniations were separate and distinct disabilities might bear further consideration. However, as Buonincontri herself denies any separate, independent cause for the C4–C5 herniation, and the medical records indicate that her neck condition grew progressively worse even after her January 2003 surgery, the Court holds that Buonincontri did not have two disabling neck conditions, one starting in December 2002 and completely resolving in March 2003, followed by a second, wholly unrelated disabling neck condition starting sometime after January 1, 2003 and continuing throughout the year. As Buonincontri's disabling

neck condition was a single disability which started before January 1, 2003, the Policy did not provide coverage to her for LTD benefits.

### ii) *Pre–Existing Condition*

■ Liberty Life argues that even if Buonincontri's C4–C5 cervical disc herniation diagnosed by Dr. Spiegel in August 2003 is a separate disability that started sometime after January 1, 2003, Buonincontri is still not entitled to LTD benefits because this disability was caused by a pre-existing condition. The Policy states that it does not cover any disability which is "caused or contributed to by, or results from a Pre–Existing Condition" and begins within the first 12 months after the effective date of coverage. It is clearly Buonincontri's position that her disability from the C4–C5 herniation began within the first 12 months after the effective date of coverage. Thus, the only remaining question is whether this disability was caused, contributed to by, or resulted from a pre-existing condition.

"Pre–Existing Condition" is defined by the Policy as "a condition resulting from an Injury or Sickness for which the Covered Person *is diagnosed or received Treatment* within three months prior to the Covered Person's effective date of coverage." (Emphasis added). Assuming a January 1, 2003 effective date of coverage (as advocated by Buonincontri), the question becomes whether Buonincontri was diagnosed or received treatment for problems with her C4–C5 disc between October 1, 2002 and December 31, 2002. The medical records clearly demonstrate that she did.

On November 6, 2002, Dr. Shim reported that "radiographic views are obtained and show a minor instability at C4–C5 on flexion and extension." Further, on December 5, 2002, Dr. Shim's office note clearly states, "[i]t was discussed that she may develop trans-junctional instability

and further degeneration at the C4–C5 level in the future but we will not address that at this time." Based on these two records, it is clear that Buonincontri was diagnosed or received treatment for a degenerative disc condition at C4–C5 within three months prior to her effective date of coverage.

Buonincontri contended at oral argument that there was no finding of herniation in November or December 2002, and therefore the disability caused by the C4–C5 disc herniation was not caused by a pre-existing condition. The Court rejects this overly narrow construction of the pre-existing condition provisions of the Policy. Buonincontri was diagnosed with a degenerative condition at C4–C5 in November and December 2002, and she was advised by Dr. Shim on December 5, 2002 that she would experience further degeneration of the C4–C5 disc in the future. Accordingly, this Court holds that even if the disability caused by the C4–C5 cervical disc herniation was a distinct disability from that caused by the C6–C7 cervical disc herniation, Buonincontri was still not entitled to LTD benefits, as the C4–C5 cervical disc herniation would be considered a pre-existing condition under the Policy.

### iii) *Delayed Effective Date For Insurance*

■ Finally, Liberty Life argues that, according to the Policy, Buonincontri never became insured for LTD benefits. Buonincontri first enrolled for LTD benefits during the open enrollment period at the end of 2002. She received a November 1, 2002 document from Tech Data entitled "2003 Open Enrollment For Employees on Leave of Absence." while she was already relieved from work due to disability. According to Tech Data, Buonincontri timely enrolled for LTD benefits during the open enrollment period.

Liberty Life recognizes that individuals can enroll for LTD benefits while they are

on a leave of absence. Accordingly, the Policy provides a Delayed Effective Date for Insurance provision which provides:

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness. The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

The term "Active Employment" means the employee is actively at work on a full-time basis and paid regular earnings. An employee is considered actively at work if she was actually at work on the day immediately preceding an excused leave of absence, except for medical leave due to the employee's own disabling condition.

As discussed above, the effective date for the insurance would normally be on the next anniversary date of the Policy, in this case January 1, 2003. However, it is uncontroverted that Buonincontri was not engaged in Active Employment on January 1, 2003, as she was relieved from work due to disability, waiting for her C6–C7 cervical disc surgery. Thus, according to the Policy, Buonincontri's LTD coverage would not begin until she returned to Active Employment.

Reviewing the record in the light most favorable to Buonincontri, her best argument is that she returned to Active Employment on March 18, 2003, when her doctor released her to go back to work. However, Buonincontri did not actually go to work for Tech Data on March 18th, as no job was available for her. Rather, she sought and received a leave of absence to seek a position within the company. Had Buonincontri actually worked for one day before her leave of absence, she would have met the definition for Active Employment. Because she never actually returned to work at anytime after January 1,

2003, she never became insured for LTD benefits under the Policy.

Buonincontri contends that Liberty Life waived the Delayed Effective Date for Insurance provision by virtue of the fact that Buonincontri was offered the opportunity to enroll for LTD benefits while she was already out of work on a leave of absence. This argument is not well founded. The Delayed Effective Date for Insurance provision is designed to specifically address the situation where an employee is entitled to enroll for additional insurance coverage while on a leave of absence. It prevents a disabled employee from signing up to receive LTD benefits for a disability which already is causing the employee to be relieved from work. It specifically requires that the employee return to Active Employment before the coverage is effective.

Buonincontri's coverage for LTD benefits was not illusory, however. Had Buonincontri returned to work in 2003, and then suffered a new (and not otherwise excluded) disability, the Liberty Life Policy would have provided LTD benefits. At the time Buonincontri enrolled for the LTD benefits, neither Tech Data nor Liberty Life knew that she would never return to Active Employment. There was nothing improper about offering Buonincontri the opportunity to enroll while she was on leave. By doing so, Liberty Life did not waive the protection built into the Policy for just such a situation. Accordingly, this Court holds that even if the disability caused by the C4–C5 cervical disc herniation was a distinct disability from that caused by the C6–C7 cervical disc herniation, and the disability caused by the C4–C5 cervical disc herniation was not excluded as being caused by a pre-existing condition, Buonincontri was still not entitled to LTD benefits, as she never became an insured under the Policy due to the application of the Delayed Effective Date for Insurance provision. .

Thus, given the analysis above and the evidence in support of the LTD claim denial, this Court concludes that Liberty Life did not act unreasonably or abuse any discretion in making its decision, and that its decision was not legally "wrong."

### 2. *Liberty Life's Self–Interest*

 As this Court finds Liberty Life's decision to deny the benefits was not legally "wrong," it is not necessary to consider any self interest on the part of Liberty Life. *See Johnson v. New York Life Insurance Company*, 2001 WL 1736879, *4–5, 2001 U.S. Dist. LEXIS 25619, *13 (M.D.Fla.2001). However, it should be noted that there is evidence in the record to support a finding that any inherent conflict of interest did not unduly bias Liberty Life's judgment when it made the determination that Buonincontri was not entitled to LTD benefits. First, during the STD benefit period, Liberty Life terminated Buonincontri's claim for STD benefits. Upon administrative review, Liberty Life reversed its own decision and reinstated Buonincontri's STD benefits. An insurer's willingness to overturn its own decisions on appeal in the interest of a claimant when supported by medical records and recommendations is evidence that its inherent conflict of interest did not unduly bias its judgment. *See Frados v. Continental Cas. Co.*, 363 F.Supp.2d 1349, 1361 (M.D.Fla.2005).

Second, it wasn't until October 2003 that Tech Data initially advised Liberty Life that Buonincontri first enrolled for LTD coverage during the open enrollment period at the end of 2002. As a result. Liberty Life paid Buonincontri LTD benefits from March 18, 2003 through October 7, 2003. When Liberty Life discovered that Buonincontri's LTD benefits were paid in error, it had the right to recover such benefits.[7] Despite this right of recovery, Liberty Life specifically advised Buonincontri on October 29, 2003. that it would not request reimbursement for the LTD benefits paid inadvertently on her claim. Liberty Life's decision to refrain from seeking reimbursement of more than six months of benefits paid in error is additional evidence that that any inherent conflict of interest did not unduly bias Liberty Life's judgment in this case.

Accordingly, it is

**ORDERED** that the Defendant's Motion for Summary Judgment (Doc. 15) be **GRANTED**.

The Clerk of Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff and close this case.

---

**7.** The Policy provides, "Liberty has the right to recover any overpayment of benefits caused by, but not limited to the following: ... 2. any error made by Liberty in processing a claim." (Doc. 16, A.R.36).